King Estate.

Argued November 30, 1945; reargued March 25, 1946. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*Ella Graubart,* with her *Emanuel S. Leopold, Scheeline & Leopold* and *Patterson, Crawford, Arensberg & Dunn,* for appellant.

*Howard Zacharias,* for appellee.

*Thomas N. Griggs,* with him *William D. Evans* and *Griggs, Moreland & Blair,* for Union Trust Company of Pittsburgh.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, October 1, 1946:

For the second time this case is before us. In the first case, reported in 349 Pa. 27, 36 A. 2d 504, we refused an apportionment between life tenant and the remainderman, where the application was based solely upon a corporate *merger* and where the stock was still held as part of the trust. We decided that no apportionment

should be made until (1) the increased value is distributed by a cash dividend (2) distributed as a stock dividend (3) a corporate liquidation and distribution of assets (4) sale of the stock.

Following our decision the trustee sold 89 shares of preferred stock, series A; 89 shares of preferred stock, series B, and 1000 shares of common stock, and thereafter filed its second and partial account. The court below ruled that there should be no apportionment until *all* of the stock received in the merger had been sold.

On appeal the life tenant repeated all her rejected arguments made in the former appeal respecting her right to apportionment of the stock *held* by the trustee as part of the trust. She made the additional contention that the provisions of the Uniform Principal and Income Act of May 3, 1945, P. L. 416 (No. 171), 20 PS, section 3471 et seq., were intended to apply retroactively. The effective date of this act was May 3, 1945. The decision of the court below was made on April 25, 1945, eight days before the act became effective. Appellant also contended that there should be an apportionment of the proceeds of the stock which had been *sold* by the trustee.

Concerning apportionment of the stock still forming part of the trust, we see no reason to overrule what we have already decided in this case. It is not pretended that any such right existed prior to the merger. The exchange of stock, in the merger, was *not* in payment of defaulted accrued dividends on the preferred stock. The trustee exchanged common and preferred stock which had paid no dividends for a number of years, for new stock which has paid and is still paying dividends. We said in our previous decision, pages 28 and 29: "Each trust contained shares of common and preferred stock of a corporation. The preferred stock had arrearages for dividends undeclared. The corporation effected a recapitalization and merger with two of its wholly owned subsidiaries. The trustee exchanged each share of pre-

ferred stock, with accrued dividend arrearages, for one-half share of 5% cumulative preferred stock, Series A, one-half share 5% cumulative convertible preferred stock, Series B, and one and one-quarter shares of no-par common stock; each share of $100 par common stock was exchanged for one share of no-par common stock. The recapitalization and merger did not affect the capital nor increase or decrease the surplus. The assets and financial situation of the corporation remained unchanged. The trustee, owner of the stock, neither gained nor lost by the transaction. The same property interest was represented by the new certificates of stock that had been indicated by the old. There have been no stock dividends declared, no corporate dissolution, no distribution of corporate assets, and no sale of any of the new stock by the trustee." No sound reason is advanced why we should now overrule what we have decided in this case, and in the numerous cases stemming from *Earp's Appeal*, 28 Pa. 368. We need not repeat what we have already said in our decision.

It is urged that the provisions of the Uniform Principal and Income Act of 1945, supra, are retroactive. Under the Statutory Construction Act of May 28, 1937, P. L. 1019, art. IV, section 56, 46 PS, section 556, it is provided: "No law shall be construed to be retroactive unless clearly and manifestly so intended by the Legislature." See *Painter v. Baltimore & O. R. R. Co.*, 339 Pa. 271, 13 A. 2d 396; *Com. ex rel. Duff v. McCloskey*, 353 Pa. 553, 559; *Spankard's Liquor License Case*, 138 Pa. Superior Ct. 251, 10 A. 2d 899. There is nothing in the Uniform Principal and Income Act, supra, which remotely suggests that it clearly and manifestly expressed the intent of the legislature to have the act operate retroactively. Upon the contrary, Section 17 of the act states: ". . . That the provisions of this act shall not apply to receipts and expenses received or paid prior to the effective date of this act." We therefore will not examine its provisions and we decline to apply it retroactively.

We are not in accord, however, with the ruling of the learned court below that no apportionment may be had until *all* the stock is sold or distributed. On the contrary, upon the sale or distribution of *any* of the stock, the time is appropriate for an apportionment respecting *that* stock or its proceeds. Nothing which we said in our prior decision is susceptible of, or intended to have, any other meaning. We said in that case, page 29: "There is probably no more difficult and intricate branch of the law than the *application* of what is termed the Pennsylvania, or American, Rule of Apportionment. The principle of equitable apportionment was early established (see Earp's Appeal, 28 Pa. 368), and its development and refinements are ably discussed by former Chief Justice Kephart in Nirdlinger's Estate, 290 Pa. 457, 139 A. 200, and in Waterhouse's Estate, 308 Pa. 422, 162 A. 295. There is a host of other cases, which need not be cited, dealing with various applications of the principle. In general, it is the rule that on distribution a life tenant is entitled to receive accumulated profits and earnings, except where necessary to preserve the 'intact value' of principal. Where there is a stock or cash dividend, a corporate liquidation, a sale or distribution in kind, the life tenant is entitled to such accumulated profits and earnings. It is wholly immaterial in what *form* such accumulations appear."

Prima facie, intact value is the corporate book value and this standard remains fixed unless it can be established that the elements making up the book value are not true values. Ordinarily the courts will accept the company's manner and method of charging items as correct when it is done in good faith. The value of assets carried at a nominal value is the subject of proof: *Baird's Estate,* 299 Pa. 39, 148 A. 907; *Flinn's Estate,* 320 Pa. 15, 181 A. 492; *Neafie's Estate,* 325 Pa. 561, 191 A. 56. See also: *Waterhouse's Estate,* 308 Pa. 422, 162 A. 295.

Intact value is determined as of the time the testator dies, and is so named because that value is to be kept intact for remaindermen. Intact value includes the par value of the stock, plus any accumulation of income earned before the death of the testator: *Waterhouse's Estate,* supra; *Flinn's Estate,* supra.

Nothing appears in any reported case which requires withholding apportionment until *all* of the stock has been sold and distributed, in order to ascertain and preserve intact value of all the stock. This would be contrary to the very essence of the reason behind the doctrine of apportionment. It is the life tenant's right to receive accumulated profits and earnings no matter in what *form* they may appear. But he is only entitled to receive them on a stock or cash dividend, a corporate liquidation, or a sale or distribution in kind, and then only to the extent that the intact value of principal is not impaired. Each individual share of stock possesses an intact value. Upon a sale or distribution of a portion of corporate stock held in a trust, the life tenant is entitled to receive his share of the accumulated profits and earnings upon that portion of the stock which may be sold or distributed.

No formula can be prescribed to fix with mathematical accuracy the amount due a life tenant upon an apportionment. Remaindermen are not entitled to an enhancement in value which is occasioned or reflected by such accumulations, and which would have passed to the life tenant had they been distributed. It is the *application* of the rule which is so frequently difficult. But difficulty in application is no reason for discarding a just and equitable rule. The intact value of the shares *as of the date of the death of testator* must first be ascertained. It must then be determined what, if any, accumulated profits and income existed *as of the date of the merger.* An ascertainment is necessary as to how accu-

mulations of profits and income, if any, affected or were reflected in the value of the stock received in the exchange or merger. On the sale or distribution of any portion of the exchanged stock, the life tenant is entitled to receive whatever income was thus accumulated and withheld from him, less .any amount necessary to preserve the intact value of the principal. This problem is largely in the mathematical, accounting or actuarial field, which should be brought to judicial aid in determining the correct figures in the apportionment.

The decree of the court below is affirmed in part and reversed in part and the record remitted to make an apportionment of the proceeds of the stock which has been sold, in accordance with this opinion. Costs to be paid out of the corpus.

---

DISSENTING OPINION BY MR. JUSTICE JONES:

If the dictum in *King Estate,* 349 Pa. 27, 36 A. 2d 504, with respect to the applicability of the rule of apportionment to the facts there present is now to be given effect, then that case will operate to overrule *Fisher's Estate,* 344 Pa. 607, 26 A. 2d 192, with which it is wholly irreconcilable in my opinion. It will be recalled that the decision in *King Estate,* supra, was that "This action was premature and should not have been taken". Consequently, any question on the merits of the life tenant's and the remaindermen's respective rights to the stock increment in controversy was obviously *coram non judice.* Our contemporaneous expression concerning such rights may not, therefore, be properly taken as a definitive ruling. But, the non-germane implications, as well as the direct statements of the opinion in the earlier *King Estate* case continue to persist and, inasmuch as the merits of that case and the present are identical and as I am of the opinion that the

decision in *Fisher's Estate,* supra, correctly lays down the pertinent rule, I have no alternative but to dissent.

The presently applicable rule has to do with the *allocation* (*not apportionment*) between corpus and income of securities received by a fiduciary stockholder in exchange for its former holdings as the result of a merger of the issuing corporation with wholly owned subsidiaries where the securities so received in exchange did not embrace any shares representing a distribution of earnings or profits but some of them did extinguish on a *quid pro quo* contractual basis accumulated and unpaid dividends on old preferred stock exchanged for new preferred of equal par. In no sense does the case involve any distribution of earnings or profits by way of stock issuance or exchange. No such distribution was made either in furtherance of or as a result of the merger. The capital of the corporation was not changed nor was its surplus increased or decreased by so much as a penny.

So far as the rights of the stockholders of the old preferred shares (with their accumulated but unpaid dividends of $45.75 per share) were concerned, all that happened as a result of the merger was that for one share of old cumulative preferred stock, $100 par, the stockholders received in exchange one share, in the aggregate, (viz., one-half share Series A and one-half share Series B) [1] of new cumulative preferred stock, $100 par, *and one and one-quarter shares of new, no par, common stock.* The common stock so distributed to the *preferred*

---

[1] The dividend rate on the old preferred was 7% and on the new preferred, 5%. The difference in the dividend rate could affect only the income beneficiary and not the remaindermen. In fact, the stock with the lower dividend rate, on which the dividends were paid currently, would likely have a higher market or asset value than a stock with a higher dividend rate but, upon which, unpaid dividends had accumulated for years. Also, the Series B cumulative preferred stock was convertible, as well, which is equally immaterial to the present inquiry.

stockholders did not represent either earned surplus set over to capital, or contributions of new capital, or an increase in the intrinsic value of capital assets. The incorporated worth ascribable to the additional common stock given in connection with the exchange of the preferred shares was contributed by the *common* stockholders of the corporation. By approving the plan of merger, they, i.e., common stockholders, permitted their interest in the equity in the corporation's assets to be diminished by the issuance of an increased number of *common shares of no par value* whereof they received *one share for each share of their old $100 par value common stock.* The residue of the new no par common stock issue, after the exchange of the old $100 par common on a share for share basis, provided the block of new common that was given in the merger to the preferred stockholders *in addition to* (i.e., over and above) the cumulative preferred $100 par shares they received, share for share, in the exchange.[2] The common stock thus received by the stockholders on account of their

---

[2] The increase in the number of common shares under the merger without a change in the common stock capital is readily apparent from the following summary:

| Before the Merger | No. of Shares | Capital Value (Par) |
|---|---|---|
| Common stock ($100 par), outstanding, | 576,320 | $57,632,000. |

| After the Merger | No. of Shares | Capital Value (Stated) |
|---|---|---|
| Common stock (no par) issued with the exchange of the preferred stock, | 733,920 ) | |
| | ) | |
| Common stock (no par) issued in exchange for old common ($100 par), share for share, | ) 576,320 ) | $57,632,000. |

In the case of the preferred, a total of 293,568 shares of 5% cumulative preferred stock, $100 par (Series A and B), were given in exchange for the 293,568 shares of old 7% cumulative preferred stock, $100 par, with a fixed capital value for the preferred stock both before and after the merger of $29,356,800.

preferred was given in extinguishment of the unpaid accumulated dividends on the old preferred. And, that is precisely what the issuing corporation intended the merger to accomplish. That was its stated important effect.[3] The stock therefore represented payment of the accumulated preferred dividends to which the life tenant, as the income beneficiary, was, and still is, entitled. This Court directly so ruled in *Fisher's Estate,* supra, where the contested securities were received in exchange under a plan of merger of the Crucible Steel Corporation which does not differ in any material respect from the merger plan here involved.

In the Crucible Steel merger, involved in *Fisher's Estate,* supra, the *additional stock* received was four-

---

[3] From the letter of Jones & Laughlin Steel Corporation dated June 10, 1941, to its preferred and common stockholders recommending their approval of the plan of merger at the special stockholders' meeting called for July 22, 1941, the following is taken:

"An important effect of the conversion of the present preferred stock is the removal of the present burden of accumulated dividends . . .

"The Board of Directors of the Corporation after thorough study and consideration has come to the conclusion that it is both impracticable and unwise from the standpoint of the preferred shareholders, the common shareholders, and the Corporation as a whole, to attempt over any reasonable period of time to pay off in cash the total sum of the accumulations on the preferred stock. . . .

"Under the proposed plan the present preferred shareholders will not receive their accrued and unpaid dividends . . . in cash, . . . However they will be compensated for their stock *and accrued dividends* as hereinafter set out." (Emphasis supplied).

Then followed a statement of the shares of new preferred and common that each preferred stockholder would receive.

In the corporation's Proxy Statement to its stockholders in connection with the special meeting of July 22, 1941, it is stated that,—

". . . Under the Plan of Merger, each share of the old preferred and all rights in respect thereof *(including accrued but unpaid dividends) is converted* into *the new securities* on the basis above outlined, thereby removing and eliminating the arrears of preferred dividends." (Emphasis supplied).

tenths of a share of *new preferred* on each share of old preferred exchanged and, just as in this case, the *additional stock* was contributed by the common stockholders of that company who, by approving the plan of merger, had permitted their equity (common stock) interest to be further subordinated by the issuance of the additional priority stock. As to that, Mr. Justice PARKER appropriately pointed out (pp. 612-613) that "Here the values which form the basis for issuing 40% additional preferred stock were furnished by the common stockholders and were supplied for the purpose of discharging the arrearages in preferred dividends. . . . The additional values assigned to the preferred stock issue did not come from the corpus of the estate or affect it but were supplied by another class of stockholders [viz., common] *for the purpose of paying the arrearages in dividends"*. It was consonantly held (p. 612) that "As between life tenant and remaindermen *the additional stock was in fact given in discharge of dividends and must be so treated"*. (Emphasis above supplied). The learned Justice further aptly observed (p. 615) that "The intact value of cumulative preferred shares will ordinarily . . . be the par value, if the capital is not impaired". That means, and correctly so, that, upon an exchange of preferred shares for preferred shares *on a share for share basis and both of the same par value,* no question of intact value of the preferred arises if the capital is not impaired. And, here, indisputably the capital was not impaired by the stock distribution. As I believe the above-quoted statements from *Fisher's Estate* correctly interpreted a situation identical with the one with which we are now concerned, I am compelled to disagree with the ruling in the majority opinion that this is an "apportionment" case and that "The exchange of stock, in the merger, was *not* in payment of defaulted accrued dividends on the preferred stock".

In the opinion on the former (*King Estate*) appeal, *Fisher's Estate* was distinguished (p. 31) on the ground that "[that] case involved an accounting of the proceeds from the *sale of the stock* (p. 610). It was therefore quite proper to consider *there* all those matters that are alleged to be involved in this case. It would have been premature in that case to have considered such matters unless there had been a sale." I respectfully submit that it was wholly immaterial to the decision in *Fisher's Estate* that the preferred stock there received in the exchange (including the additional stock in extinction of the accumulated and unpaid cash dividends) was later sold and that the question of the life tenant's right to the stock arose on the trustee's accounting for the proceeds of the sale. Had none of the stock been sold, the question of the life tenant's right to it would not have been premature and the decision would have been the same. As was stated in *Buist's Estate*, 297 Pa. 537, 543, 147 A. 606, a life tenant is entitled to shares of stock received as a result of a merger when "(2) distributed in the form of a stock dividend. . . ." And, was it not ruled in *Fisher's Estate* that the distribution of the *additional* shares to the preferred stockholders in that case was in discharge of the accumulated but unpaid dividend arrearages on the old preferred,—veritably, a stock dividend to the old preferred stockholders contributed by the common stockholders without resort to the company's earnings, its surplus or its capital assets?

It seems obvious that *a sale* of securities received through exchange in a merger can not be made to determine the time when such of the securities as were given in discharge of accumulated dividend arrearages are allocable to the life tenant. A subsequent sale of securities, so received by a trustee, is an administrative matter occurring after the event which established the ownership. The rights of the parties are fixed at the time

of the distribution, made pursuant to an approved merger. And, if a portion of the distributed securities are issued and received in discharge of a dividend arrearage liability, then they belong to the life tenant whether or not they have been converted: *McKeown's Estate,* 263 Pa. 78, 86-87, 106 A. 189. That is so, as we have seen, under the category set out in *Buist's Estate,* supra, even though, as Mr. Justice PARKER pertinently noted in *Fisher's Estate* (p. 612),— ". . . the summary there given [in *Buist's Estate*] did not define precisely all circumstances warranting an apportionment: [citing case]". In no event may income be accumulated in a trustee's hands by his withholding a sale of securities constituting income. His omission to distribute can not affect the life tenant's ownership or right to possession of the income: cf. *Maris's Estate,* 301 Pa. 20, 24, 151 A. 577.

The rule as to apportionment laid down in *Earp's Appeal,* 28 Pa. 368, and since consistently followed by the courts of this State many times has no applicability to the situation presented by the facts of this case. That rule properly attaches and controls in determining the respective rights of life tenants and remaindermen to a distribution of *earnings* or *gains* and *profits* either by way of an extraordinary cash dividend or a stock dividend upon corpus stocks. While the life tenant is presumptively entitled to such dividends, so much thereof as is necessary to preserve intact the value of the corpus stock, as of the date of the creation of trust (ordinarily the time of the testator's death), must be apportioned to corpus: see *Waterhouse's Estate,* 308 Pa. 422, 428, 162 A. 295, and cases there cited.

Intact value is, prima facie, book value: *Baird's Estate,* 299 Pa. 39, 42, 148 A. 907, and *Waterhouse's Estate,* supra. The reported decisions in this State disclose that, to date, the question of intact value has been

raised exclusively with respect to common stocks: see *Fisher's Estate,* supra, at p. 608. Nor has that circumstance been fortuitous. Subject to lien and property securities (e. g. bonds and preferred stock), the common stockholders are the equitable owners of the assets of a company. The book value of their stock is necessarily affected by a distribution of earnings or profits. If such distribution is sufficiently large to diminish the book value of the stock below what it was when the trust came into being (i.e., at the death of the testator), then there is an impairment of the intact value which must be restored out of the distribution. But, that is not so with regard to preferred stock. While its right to a proportionate interest in the assets of the company is preferential, the amount thereof is fixed at par and its book value remains constant. It never varies as the result of an addition of earnings or profits to surplus or a distribution thereof, whether current or accumulated. Its book value remains one and the same unless the preferred capital of the company is impaired which, of course, cannot lawfully happen from dividend distributions to stockholders. In the instant case, the intact value (i.e., book value) of the new preferred was exactly the same as was the intact value of the old preferred. And, that was known the day the distribution in exchange was made to the trustee as well as now. There was, therefore, no occasion for apportionment nor for a witholding of the dividend stock from the life tenant until there had been a *sale* thereof.

Incidentally, the trustee has already sold 1,000 shares of the new no par common stock received in the merger (part on its common stock exchange). Among those shares were the 972 ear-marked shares received in payment of the dividend arrearages on the old preferred stock. So that, there has been a sale if that were important. Hence, even under the majority opinion the time for the determination of the life tenant's right

to the proceeds of the common (dividend) stock has arrived. If, however, the requirement of the majority opinion means that there must also be a sale of the preferred stock received in the exchange, no basis for the ruling is apparent. The sale price of the preferred (i.e., its *market value* at the time sold) would have no materiality in establishing its intact value after the exchange distribution. Market value is not evidence of intact value: see *Baird's Estate,* supra, at p. 42.

There is one more matter which the trustee urgently presses upon us for decision. The life tenant objected to the trustee's espousal of the remaindermen's claim to the dividend stock. The learned court below ruled, correctly, I believe, that the trustee was but a stakeholder and therefore not permitted to take sides between the life tenant and the remaindermen : see *Buist's Estate,* supra, at p. 542; *Thompson's Estate,* 262 Pa. 278, 281, 105 A. 273; Restatement, Trusts, § 183. The fact that the trust contained spendthrift provisions did not change the trustee's proper rôle as between interested beneficiaries. In fact, the trustee's preference of the remaindermen to the disadvantage of the life tenant was hardly in keeping with the desire of the testator. It is not to be presumed that he intended that the life tenant would ". . . be required to starve in order that remaindermen may ultimately feast :" *Nirdlinger's Estate (No. 2),* 327 Pa. 171, 174, 193 A. 30. For my own part, I have had not a little difficulty in trying to fathom the peculiarly fiduciary motive that could have prompted the trustee's zeal in its endeavor to have it judicially established that the common stock, given in discharge of the accumulated dividend arrearages on the old preferred, was corpus and not income.

Mr. Justice DREW and Mr. Justice PATTERSON join in this dissent.